IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NISSAN FORKLIFT CORPORATION, )
NORTH AMERICA, )
 )
    Plaintiff, ) No. 05 C 4849
 )
v. ) Paul E. Plunkett, Senior Judge
 )
ZENITH FUEL SYSTEMS, L.L.C., )
PRECISION AEROSPACE GROUP, )
L.L.C. and ZENITH POWER )
PRODUCTS, L.L.C., )
 )
    Defendants. )
 )

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff's motion to compel arbitration, stay and sever only Count II of Defendants' counterclaim as well as Defendants' motion to compel arbitration of all claims and counterclaims or alternatively to stay all claims pending an arbitration award as to Count II of their counterclaim. For the reasons provided below, Plaintiff's motions are granted in part and denied in part, while Defendants' motions are granted in part and denied in part.

### Background

For purposes of deciding the present motions, the Court "draws the background facts from the parties' pleadings, but will also consider attached exhibits and affidavits." *Reineke v. Circuit City Stores, Inc.*, No. 03 C 3146, 2004 WL 442639, at *1 (N.D. Ill. Mar. 8, 2004) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992)). Moreover, "[w]here the facts are disputed, the

court accepts Plaintiff's version, *Tumock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987), but [in this case] the facts are largely undisputed." *Id.*

This is a somewhat complicated commercial litigation matter involving two claims and two counterclaims allegedly created by three contracts entered into over a several year period. In approximately 1998, Plaintiff, Nissan Forklift Corporation, North America ("Nissan") contacted Defendant Zenith Fuel Systems, L.L.C. ("Zenith") regarding the manufacture of a liquified propane gas fuel system for use in Nissan manufactured forklifts. After cooperating to design a fuel system meeting Nissan's requirements, in June 2000, Zenith signed a document titled "NISSAN FORKLIFT CORPORATION, NORTH AMERICA PURCHASE ORDER VIA FACSIMILE AGREEMENT." In this facsimile purchase order agreement ("Master Purchase Order"), Nissan sought to establish the general terms and conditions for all future purchase orders by Nissan of Zenith's fuel systems. *See generally* Compl. Ex. A. The document provided that Nissan's "general terms and conditions are attached" and that they "shall be used to govern all future purchase orders" until Nissan received "written notice that this agreement is no longer applicable." *Id.* Though the general terms and conditions attached to Nissan's complaint are dated January 1, 2002, a full year-and-a-half after Zenith signed the Master Purchase Order, both the Master Purchase Order and its general terms and conditions are silent as to the issue of arbitration.[1]

---

[1] Zenith appears to suggest that it never received a copy of Nissan's terms and conditions in arguing that it "has not located a copy of the Facsimile Agreement, and there is no evidence that Nissan's general terms and conditions were attached to the generic one page form." Defs.' Mem. Supp. Mot. Compel Arb. at 4. However, in answering Nissan's complaint, Zenith admitting signing the June 15, 2000 agreement, which specifically referenced that Nissan's "general terms and conditions are attached." *Compare* Compl. Ex. A *with* Answer ¶ 9. Moreover, in signing that agreement, the undersigned representative for Zenith agreed to Nissan's "attached terms of purchase as general terms and conditions for all future [Nissan] purchase orders." *See* Compl. Ex. A.

By 2002, Nissan began selling forklifts incorporating Zenith's fuel system to the public. Am. Compl. ¶ 10. However, shortly after such sales began, Nissan alleges its customers began to experience various problems with Nissan forklifts equipped with Zenith's fuel system. *Id.* In response, Nissan and Zenith together attempted to resolve the various problems. *Id.* ¶ 11. Nissan thereafter submitted warranty claims to Zenith pursuant to what it claims to be the terms of the Master Purchase Order. *Id.* ¶ 12. Yet, despite this initial cooperation, Nissan contends in its amended complaint that while Zenith initially honored Nissan's warranty claims, Zenith later began denying such claims as their numbers continued to increase. *Id.*

In an attempt to settle Nissan's warranty claims, the parties entered into a second contract in March 2004, namely a warranty settlement agreement. Nissan agreed that it would "provide to Zenith a full release and settlement of all warranty, labor and miscellaneous claims made prior to October 31, 2002" while Zenith agreed to pay $110,000.00 in addition to amounts already provided to Nissan by Zenith. Countercl. Ex. 1 ¶ 2. Moreover, the parties agreed that for claims made after that date, they would "discuss and settle amicably from time to time based on the spirit of mutual trust and the basic concept of cost sharing as agreed upon previously." *Id* ¶ 3. Additionally, in Paragraph 4, it appears that the parties attempted to assign a cause to the various problems giving rise to Nissan's warranty claims. *Id.* ¶ 4. Specifically, the parties acknowledged that "many of the problems" with the fuel system Zenith supplied Nissan "might be due to contaminated fuel." *Id.* ¶ 5. As a result, the parties agreed to cooperate with each other in the investigation of the problem. *Id.*

Apparently unable to resolve their issues amicably, on August 22, 2005, Nissan filed suit against Zenith and its affiliates, Precision Aerospace Group, L.L.C. and Zenith Power Products,

L.L.C. (collectively the "Zenith Defendants"), invoking diversity jurisdiction. As currently drafted, Nissan's two-count amended complaint alleges breaches of warranty and contract by Zenith of the Master Purchase Order and also that Precision Aerospace Group and Zenith Power Products, as joint venturers, "are jointly liable for the acts and omissions of [Zenith], and for all of the damages proximately caused thereby."[2]

In response, the Zenith Defendants filed a counterclaim against Nissan for alleged breaches of contract arising from the March 2004 warranty settlement agreement as well as that of a third contract, the "Master Distributor Agreement," which the parties entered into on June 25, 2003. Countercl. ¶¶ 31-40; *see also* Countercl. Ex. 2 (attaching a copy of the Master Distributor Agreement). Pursuant to the Master Distributor Agreement, Nissan agreed to sell its engines to Zenith such that Zenith would serve as the "exclusive distributor" of Nissan manufactured engines in the United States and Canada. Countercl. Ex. 2 ¶¶ 1-2, 5(a). Nissan also agreed to "renegotiate or terminate in accordance with terms and conditions satisfactory to Zenith, all existing distributor agreements between Nissan Industrial Engine Operations ("NIEO"), a division of [Nissan] and third parties" including, but not limited to, an enumerated list attached as an exhibit to the Master Distributor Agreement. *Id.* ¶ 5(b).

Unlike the Master Purchase Order and its general terms and conditions, the Master Distributor Agreement provided for arbitration. In pertinent part, Paragraph 13(i) provides:

---

[2] Nissan's August 22, 2005 complaint also contained an allegation of strict liability by Zenith arising out of its fuel system design and manufacture. However, this count was withdrawn when Nissan amended its complaint on January 6, 2006.

> It is the intention of the Parties that any claim, action or proceeding arising under or in connection with this Agreement or the transactions contemplated hereunder between [NISSAN] and Zenith or the end of that relationship, shall be resolved by final and binding arbitration.
>
> . . . .

Countercl. Ex. 2 ¶ 13(i).

Moreover, it appears that the parties agreed in two separate sections that the Master Distribution Agreement would control over other documents or agreements in certain situations. For example, Paragraph 13(e) provides an integration clause:

> This Agreement supercedes all prior understandings, letters of intent, discussions, negotiations or agreements of the parties. No amendment or modification of this Agreement shall be effective unless in writing and signed by the parties.

*Id.* ¶13(e). Additionally, in Paragraph 13(k), the parties further note that:

> The terms of this Agreement shall govern in the event of any conflict with the terms and conditions contained in either Zenith's purchase order or in [Nissan's] sales invoice form.

*Id.* ¶ *13*(k).

After Nissan filed its complaint and Zenith filed its counterclaims, on November 15, 2005, Nissan moved to sever and stay only Count II of Zenith's counterclaim, which alleges a breach by Nissan of the Master Distributor Agreement, arguing that arbitration should be compelled to resolve the dispute as to that single issue. In response, Zenith has moved this Court to compel arbitration as to *all* claims raised by both Nissan and Zenith. Alternatively, Zenith argues for a stay as to all claims in this case in the event this Court were to find that only Count II of Zenith's counterclaim is subject to arbitration.

## Analysis

I.  **Nissan's Motion to Compel Arbitration as to Count II of Zenith's Counterclaim and Zenith's Motion to Compel Arbitration as to All Claims.**

"Under the Federal Arbitration Act, arbitration may be compelled if the following three elements are shown: a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate." *Zurich Am. Ins. Co. v. Watts Indust., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005) (citing 9 U.S.C. § 4; *Kiefer Spec. Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909-10 (7th Cir. 1999)). Moreover, "[w]hether or not [a] company [is] bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties." *Id.* at 691 (quoting *AT&T Techs., Inc. v. Commc'ns. Workers of Am.*, 475 U.S. 643, 649 (1986)) (alterations in original).

In determining whether to submit a claim for arbitration, there are a number of general principles that guide this Court in reaching a decision. First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs.*, 475 U.S. at 648 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). "This axiom recognizes the fact that arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *Id.* at 648-49 (citing *Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368, 374 (1974)). Second, "the question of arbitrability . . . is undeniably an issue for judicial determination" and "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *Id.* at 649 (citing *Warrior & Gulf*, 363 U.S., at 582-83). Third, "in deciding whether the parties have

agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *Id.* at 649. Finally, "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *Id.* at 649-50 (quoting *Warrior & Gulf,* 363 U.S., at 582-83).

Nissan argues that Count II of Zenith's counterclaim, based on an alleged breach by Nissan of its obligations under the Master Distributor Agreement, must be referred to arbitration. The Court agrees. As noted above, pursuant to Paragraph 13(i) of the Master Distributor Agreement, the parties agreed in writing to arbitrate "any claim, action or proceeding arising under or in connection with this Agreement or the transactions contemplated hereunder between [NISSAN] and Zenith . . . ." Countercl. Ex. 2 ¶ 13(i). Count II of Zenith's counterclaim, which seeks damages from Nissan for its alleged breach of the Master Distributor Agreement, is clearly within the scope of that agreement's arbitration provision, because it pertains to "any claim, action or proceeding" that arises under or is connected with the Master Distribution Agreement. *See id.* Finally, Nissan has shown a refusal to arbitrate. In a letter dated October 20, 2005, addressed to counsel for the Zenith defendants, counsel for Nissan invoked the arbitration clause and by at least November 5, 2005, counsel had not received a response. *See* Pl.'s Mot. Compel Arb. Ex. A & B. Presumably, they never did as ten days later, on November 15, 2005, Nissan moved this Court to sever and arbitrate Count II. Thus, the Court grants Nissan's motion to compel arbitration as to Count II of Zenith's counterclaim.

However, while the resolution of Nissan's motion to compel arbitration seems simple enough, Zenith complicates the Court's analysis by filing its own motion to compel arbitration. Though Zenith does not dispute now that its counterclaim concerning the Master Distribution Agreement is subject to arbitration, Zenith posits that *all* claims pending before this Court should be compelled to arbitration.[3] To support this conclusion, Zenith argues: (1) that the Master Distributor Agreement contains an "expansive arbitration clause . . . superceding all prior agreements"; (2) that the agreements giving rise to each party's claims are "intimately related" because Zenith's fuel system was involved in the underlying agreements which create each party's respective claims and counterclaims; and (3) that Nissan's joining of Zenith Power as a defendant undermines Nissan's argument for severance, contending that by doing so, Nissan asserted "a broad relationship to capture Zenith Power as a defendant" but now "asserts a narrow relationship to avoid the reach of the broad arbitration provision." Defs.' Mem. Supp. Mot. Compel Arb. at 9-11.

Notwithstanding Zenith's framing of its arguments as detailed above, the critical issue this Court must decide with respect to Zenith's motion to compel arbitration as to the remaining claims and counterclaim is whether they are "within the scope of the arbitration agreement."[4] *Zurich Am. Ins. Co.*, 417 F.3d at 687. If they are, this Court has no choice but to compel arbitration. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985) (concluding "that a court must compel

---

[3]Alternatively, Zenith argues that "if this Court were to determine that only Count 2 of Zenith's counterclaim is subject to arbitration, the remaining claims in this action should be stayed, pending the arbitration award, because the claims are interwoven." Defs.' Mem. Supp. Mot. Compel Arb. at 14.

[4]In making this determination the Court assumes *arguendo* that the Master Distributor Agreement supercedes all prior agreements entered into between the parties. *But see infra* at 12-14.

arbitration of otherwise arbitrable claims[] when a motion to compel arbitration is made"). As noted, the arbitration provision in Paragraph 13(i) mandates final and binding arbitration for "any claim, action or proceeding arising under or in connection with this Agreement or the transactions contemplated hereunder . . . ." Countercl. Ex. 2 ¶ 13(i). Thus, the Court must determine whether Nissan's claims and Count I of Zenith's counterclaim "arise under" or are "connected with" the Master Distribution Agreement or the transactions "contemplated" under that agreement, even if it results in piecemeal litigation. *See Universal Restoration Servs., Inc. v. Paul W. Davis Sys., Inc.*, No. 98 C 2027, 2002 WL 596380, at *2 (N.D. Ill. Apr. 17, 2002) (noting that "[p]arties are required to arbitrate claims they agreed to arbitrate even if the result is 'piecemeal' litigation") (citing *Dean Witter*, 470 U.S. at 221). To do so, the Court will address first each party's allegations, then determine whether they are individually within the scope of the arbitration clause.

First, with respect to Nissan's amended complaint, pursuant to Count I, Nissan contends that it entered into an enforceable contract with Zenith pursuant to the Master Purchase Order, under which Nissan obligated itself to purchase fuel systems from Zenith. *See* Am. Compl. ¶ 15. After performing all of its obligations, Nissan now alleges that it was damaged by Zenith's (1) refusal "to honor valid warranty claims" in accordance with its obligations under the Master Purchase Order, (2) breach of the express warranties contained therein, (3) breach of the implied warranty of merchantability, and (4) breach of the implied warranty of fitness for a particular purpose. *Id.* ¶ 17. Second, in Count II, Nissan seeks to hold liable Zenith's affiliates, Precision and Zenith Power, by virtue of the allegation that they were joint venturers with Zenith in the "design, manufacture, assembly, marketing, testing and/or distribution" of the Zenith fuel system supplied by Zenith for use in Nissan's forklifts. *Id.* ¶¶ 21-22. Finally, with respect to Zenith's remaining counterclaim,

Count I alleges that Nissan breached the March 2004 warranty settlement agreement by failing to cooperate in the investigation issues associated with fuel contamination as well as failing to conform to its various other obligations under that agreement. *See* Countercl. ¶¶ 31-35.

In reviewing the gravamen of the claims and counterclaims, the Court finds "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers" the remaining allegations, notwithstanding a presumption of arbitrability. *AT&T Techs.*, 475 U.S. at 649-50. The Court reaches its decision, in part, due to the Seventh Circuit's review of various arbitration clauses in *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress International, Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993). In *Sweet Dreams*, a case cited by Zenith, the Seventh Circuit construed an arguably broad arbitration provision containing the words "arising out of." In reaching its decision the *Sweet Dreams* court compared its arbitration clause, containing "arising out of," with the clauses found in two cases reported by the Second and Ninth Circuits, cases relied upon by the district court judge in his denial of a motion to compel arbitration. The cases respectively contained the words "any disputes arising *hereunder* . . . " and "any dispute or difference [that] should arise *under* [the agreement]." *Sweet Dreams*, 1 F.3d at 642 (comparing *In re Kinoshita & Co.*, 287 F.2d 951 (2d Cir. 1961) with *Mediterranean Ent., Inc. v. Ssagyong*, 708 F.2d 1458, 1464 (9th Cir. 1983) (alterations and emphasis in original).

In reversing the decision of the district court, the court distinguished the "arising out of" clause before it from those relied upon by the district court. The court noted "that 'arising *out of*' reaches all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se.'" *Id.* (emphasis in original). Importantly, for purposes of the present case, the Seventh Circuit took note that "[b]oth courts accepted the argument

that such clauses encompass only those disputes that relate to the interpretation and performance of the contract itself." *Id.* Moreover, the court found "no need to disagree with the Second and Ninth Circuits that 'arising under' may denote a dispute somehow limited to the interpretation and performance of the contract itself." *Id.*

Unlike the arbitration clause in *Sweet Dreams*, which contained the words "arising out of," the arbitration clause at issue in this case contains the words "arising under" *and* "hereunder." *Sweet Dreams*, 1 F.3d at 642; Countercl. Ex. 2 ¶ 13(i). The Master Distributor Agreement sought to establish an exclusive distribution relationship between Nissan and Zenith, pursuant to which Nissan would sell its engines to Zenith. *See generally* Countercl. Ex. 2; *see also* Pl.'s Mot. Compel Arb. at 6. Under that agreement, Zenith would also have the ability to distribute such engines to third-parties. *See* Master Distributor Agreement ¶¶ 1 & 4(a). In contrast, in the Master Purchase Order, a separate agreement entered into approximately three-years prior to the Master Distributor Agreement, Nissan sought to set the terms governing Nissan's purchase from Zenith of fuel systems. *See generally* Compl. Ex. A.

Count I of Nissan's amended complaint seeks damages for the problems associated with the fuel systems purchased by Zenith and does not appear to concern the Master Distributor Agreement, or the transactions contemplated under that agreement. *See* Am. Compl. ¶¶ 14-19. Similarly, Count II of Nissan's amended complaint seeks to hold Zenith's affiliates liable for their role in the problematic fuel systems sold by Zenith to Nissan. *See id.* ¶¶ 20-22 (arguing that "[a]s joint venturers, Precision and [Zenith Power Products] are jointly liable for all of the aforementioned actions and omissions" of Zenith). Likewise, Count I of Zenith's counterclaim alleges a breach by Nissan of the warranty settlement agreement. *See* Countercl. ¶¶ 31-35. This counterclaim, which

does not concern the subject matter of the Master Distributor Agreement, clearly shows that Zenith seeks damages for breach of the warranty settlement agreement. *Id.* If anything, Count I of Zenith's counterclaim "arises under" or "is connected with" the *Master Purchase Order* since it pertains to the settlement of warranty claims submitted by Nissan for Zenith fuel systems it purchased then resold to customers in forklifts. *See* Compl. Ex. A. This Court cannot say that the Nissan/Zenith arbitration provision, which addresses disputes "arising *under* or in connection with [the Master Distributor] Agreement or the transactions contemplated *hereunder*," also reaches disputes which have their origin or genesis in another agreement. *See* Countercl. Ex. 2 ¶ 13(i) (emphasis added). This position is not tempered by the inclusion of the words "in connection with" which, though broad, nevertheless demonstrates an inextricable link with the Master Distributor Agreement itself. Thus, it appears that the arbitration agreement is limited to issues associated with the interpretation and performance of the Master Distributor Order itself. As a result, the Court finds that the remaining claims and counterclaim are not within the scope of the arbitration clause because they do not "arise under" the Master Distributor Agreement and are neither connected with it or the transactions contemplated thereunder.

Furthermore, the Court notes that in reaching the above conclusion, it assumed *arguendo* that the Master Distributor Agreement superceded the Master Purchase Order because of the integration clause found in Paragraph 13(e) of the Master Distributor Agreement - Zenith's argued position. *See* Defs.' Mem. Supp. Mot. Compel Arb. at 6. However, in reviewing that agreement's integration clause, it appears that Zenith misconstrues the function of such clauses. As the Seventh Circuit has noted, "[b]y virtue of the parol evidence rule, an integration clause prevents a party to a contract from basing a claim of breach of contract on agreements or understandings, whether oral or written,

that the parties had reached during the negotiations that eventuated in the signing of a contract but that they had not written into the contract itself." *Vigortone AG Products, Inc. v. PM AG Products, Inc.*, 316 F.3d 641, 644 (7th Cir. 2002) (emphasis added). This position is consistent with that set forth by the Supreme Court of Illinois in *Air Safety, Inc. v. Teachers Realty Corp.*, 751 N.E.2d 882, 885 (Ill. 1999), which noted that "where parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence."

Thus, in reviewing Nissan's amended complaint and Count I of Zenith's counterclaim, it does not appear that Nissan or Zenith seek to hold the other liable for promises or understandings made during the negotiation of the Master Distributor Agreement, promises or understandings which ultimately were not incorporated into that agreement. Rather, each seek to hold the other liable for obligations created in two other agreements. *Compare* Am. Compl. ¶¶ 14-22 *with* Countercl. ¶¶ 31-35. As a result, the Court finds that the Master Distributor Agreement's integration clause does not operate to impose its arbitration clause on the Master Purchase Order and the warranty settlement agreement, particularly when those agreements create different obligations than those created by the Master Distributor Agreement. *See GCIU Employer Ret. Fund v. Chicago Tribune Co.* 66 F.3d 862 (1995), 865-66 (7th Cir. 1995) (noting that *Hartbarger v. SCA Services, Inc.*, 558 N.E.2d 596, 601-02 (Ill. App. Ct. 1990), held "that an independent contract pertaining to a different subject matter is not barred by the parol evidence rule, even where the parties' subsequent contract contains an integration clause"). *See also Pappas v. Waldron*, 751 N.E.2d 1276, 1283 (Ill. App. Ct. 2001) (declining to consider extrinsic evidence because of an integration clause substantially similar to that in the present case and noting that the agreement at issue before the *Pappas* court "constitute[d] the

entire agreement between the parties *relating to the subject matter hereof,* superseding all prior agreements, and may be modified only by a written instrument executed by all parties") (citing *Air Safety*, 751 N.E.2d at 1283) (emphasis added). Accordingly, the Court denies Zenith's motion to compel arbitration of all remaining claims.[5]

## II. Nissan's Motion to Stay Count II of Zenith's Counterclaim and Zenith's Motion in the Alternative to Stay All Remaining Claims Pending an Arbitration Award.

Having determined that arbitration is appropriate as to only one of four issues before the Court, the Court must decide whether and to what extent a stay is appropriate in the present litigation. Nissan has moved to stay solely Count II of Zenith's counterclaim, while Zenith moves to stay all claims pending arbitration on Count II of its counterclaim. Stays in cases involving arbitration agreements are governed by Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3. Specifically, Section 3 of the Federal Arbitration Act provides:

> If *any* suit or proceeding be brought in any of the courts of the United States upon *any issue* referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall* on application of one of the parties stay the trial of the action *until such arbitration has been had* in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphases added). "The use of the word 'shall' rather than 'may' in Section 3 indicates

---

[5] In reaching its decision on whether to compel arbitration, the Court stresses that it is not ruling on any potential merits of the underlying claims. *See AT&T Techs.*, 475 U.S. at 649. Moreover, the Court notes that while judicial efficiency might best be served by compelling arbitration as to all claims and counterclaims, having determined that the Master Distributor Agreement's arbitration clause applies only to that agreement, this Court cannot compel arbitration as to the other claims and counterclaims since "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs.*, 475 U.S. at 648.

that a district court, when presented with an application for a stay of proceedings pending arbitration, must grant the requested stay where two conditions are satisfied: (1) the issue is one which is referable to arbitration under an agreement in writing for such arbitration, and (2) the party applying for the stay is not in default in proceeding with such arbitration." *C. Itoh & Co. (Am.) Inc. v. Jordan Int'l Co.*, 552 F.2d 1228, 1231 (7th Cir. 1977). Having determined that Count II of Zenith's counterclaim is subject to arbitration, and noting that Nissan is not in default in proceeding with arbitration, the Court is obligated to stay at least Count II of Zenith's counterclaim, pending completion of arbitration as to the issues raised by that counterclaim.

But what about Zenith's argument that *all* claims and counterclaims should be stayed pending arbitration? The Court finds the decision in *Air Freight Services, Inc. v. Air Cargo Transport, Inc.*, 919 F. Supp. 321 (N.D. Ill. 1996), as instructive as to the issue of whether to stay an entire proceeding pending arbitration where a majority of the counts are not subject to arbitration. In *Air Freight*, the plaintiff filed a five-count complaint in state court on various state grounds. After removal to federal court, the defendant moved to stay the proceedings pending arbitration as to two counts concerning a contract which contained an arbitration provision.

In determining whether to stay the proceedings, the court emphasized the mandatory nature of Section 3 of the Federal Arbitration Act. *Id.* at 324. Citing *Itoh,* in which the Seventh Circuit reversed a "district court that denied a stay pending arbitration because some issues involved in the case were not referable to arbitration," the court noted that "a court should stay litigation pending arbitration even when the arbitration would not necessarily resolve all of the issues raised by the parties in the litigation." *Id.* at 324 (citing *Itoh*, 552 F.2d at 1230-32). Thus, notwithstanding the fact that only two of the five counts were subject to an arbitration provision, the court found a stay

as to all counts appropriate until the parties had the opportunity to arbitrate the arbitrable counts. *Id.* As the court concluded: "The fact that some of the issues involved in the case are arbitrable is enough to require the entire case to be stayed pending arbitration of the arbitrable issues." *Id.* at 325 (citing U.S.C. § 3; *Itoh,* 552 F.2d at 1230-32; *Morrie & Shirlee Mages Found. v. Thrifty Corp.,* 916 F.2d 402, 406-08(7th Cir. 1990); *Kroll v. Doctor's Assocs., Inc.,* 3 F.3d 1167, 1171 (7th Cir. 1993)).[6]

Like *Air Freight,* only one of the four claims and counterclaims before the Court is subject to an arbitration provision. Having already determined that Count II of Zenith's counterclaim is subject to arbitration, and noting that Zenith is not in default in proceeding with arbitration, the Court likewise is obligated to grant Zenith's request for a stay of all claims and counterclaims pending completion of arbitration as to the issues raised by Count II of its counterclaim. Indeed, Section 3 of the Federal Arbitration Act compels this result as it mandates that this Court grant a stay of an action when the action contains "any issue" that is referable to arbitration.

Though it might seem more efficient to have the parties proceed with the non-arbitrable claims and counterclaim while staying only the arbitrable counterclaim because of judicial economy reasons, the Seventh Circuit has explicitly discouraged such an approach. Indeed, the Seventh Circuit has instructed that "[c]onsiderations of judicial economy bear *no relation* to the making and performance of an agreement to arbitrate, and to permit a district court to deny a stay pending arbitration based on such discretionary considerations would, in our opinion, frustrate the strong

---

[6]The *Air Freight* court appears to have reached its decision, in part, on the fact that the entire dispute before the court hinged upon an interpretation of an agreement which was subject to an arbitration provision. *See Air Freight,* 919 F. Supp. at 325. Thus, in this respect *Air Freight* is arguably distinguishable. Nevertheless, because of the mandatory nature of Section 3 of the Federal Arbitration Act, a stay as to all claims and counterclaims is still appropriate in this case.

federal policy in favor of arbitration which is expressed in the Federal Arbitration Act as interpreted by the Supreme Court. *Itoh*, 552 F.2d at 1231 (emphasis added and internal quotation omitted). *Cf. Air Freight*, 919 F. Supp. at 325-26 (rejecting "plaintiffs' request to stay defendants' request to arbitrate arbitrable issues while resolving the non-arbitrable issues in court") (citing *Dickinson v. Heinhold Securities, Inc.*, 661 F.2d 638, 641-43 (7th Cir. 1981)). Accordingly, the Court denies Nissan's motion to stay only Count II of Zenith's counterclaim and grants Zenith's motion to stay all claims and counterclaims pending arbitration as to Count II of its counterclaim.

### III. Nissan's Motion to Sever Count II of Zenith's Counterclaim.

As a final matter, in addition to asking this Court to stay and compel arbitration as to the second count of Zenith's counterclaim, Nissan asserts that Zenith's counterclaim "should be severed pursuant to Federal Rule of Civil Procedure 21. . . ." Pl.'s Mot. Compel Arb. at 6. As Nissan argues: "[i]f the two disputes are severed, the parties would likely have a greater opportunity to focus on separate and independent bases for their disputes and resolve them more efficiently and effectively." Pl.'s Resp. Mot. Compel Arb. at 15. "[R]ule 21 gives the court discretion to sever any claim and proceed with it separately if doing so will increase judicial economy and avoid prejudice to the litigants." *Remcor Prods. Co. v. Servend Int'l, Inc.*, No. 93 C 1823, 1994 WL 594723, at *2 (N.D. Ill. 1994) (citing *Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 743 (7th Cir.1985)). However, because the Court finds that a stay as to all claims and counterclaims is required by Section 3 of the Federal Arbitration Act, judicial economy will not be served at this point in time by a severance. Accordingly, the Court denies without prejudice Nissan's motion to sever as moot.

## Conclusion

For the reasons provided above, the Court: (1) grants Nissan's motion to compel arbitration as to Count II of Zenith's counterclaim, (2) denies Zenith's motion to compel arbitration as to all claims, (3) denies Nissan's motion to stay only Count II of Zenith's counterclaim pending arbitration, (4) grants Zenith's motion to stay all claims pending arbitration of Count II of its counterclaim, and (5) denies without prejudice Nissan's motion to sever Count II of Zenith's counterclaim as moot.

**ENTERED:**

DATED: Mar. 3, 2006

**UNITED STATES DISTRICT JUDGE**